Filed 03/13/24

## STATE OF VERMONT

**SUPERIOR COURT**                                              **CIVIL DIVISION**
**Addison Unit**                                           **Docket No. 86-5-20 Ancv**


**JACQUELYN D. SCHMIDT and**
**GRETCHEN S. CONKEY as**
**Co-Trustees of the SCHMIDT LIVING TRUST,**
    **Plaintiffs**

**v.**

**RICHARD ESS and ROBERT ESS,**
**AMY MENARD, Administrator of the**
    **ESTATE OF MARION MACGOWAN,**
**DONNA MACGOWAN,**
**MICHAEL A. ZIGROSSI, Trustee of the**
    **CHRISTINE L. ZIGROSSI IRREVOCABLE TRUST,**
**JOHN KAHRS and GENNIE RIM,**
**SCHAEFER & SMITH, LLC,**
**PHILIP and DEBORAH BARONE,**
**SHAWN R. O'CONNOR,**
**KRISTEN LANDERMAN and BRYAN LANDERMAN, Trustees of the**
    **LANDERMAN TRUST, U/T/A DATED 10/1/14,**
    **Defendants**


### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs are Co-Trustees of a Trust that owns property on Lake Champlain. They seek a declaration that they have a prescriptive easement for access to and from the property over a portion of a private road known as Wolf Road. Defendants are all persons or entities who have legal interests in Wolf Road or are alleged to have such interest.

A court trial was held on January 29 and 30, 2024. All parties and their attorneys were present in person or by Webex. The court had previously conducted a site visit to the property. Post-trial memoranda have been filed by some parties.

Based on the credible evidence, the court makes the following Findings of Fact and Conclusions of Law.

1

**Findings of Fact**

The pertinent section of the road now known as Wolf Road[1] runs from east to west between Lake Street, which is parallel to the shoreline of Lake Champlain in the Town of Addison, and several properties lined up along the shore of Lake Champlain on which summer cottages have been located for years.

Plaintiffs are Co-Trustees of the Schmidt Living Trust, owner of the subject parcel, which is a lot of approximately one acre with a cottage and garage with frontage on Lake Champlain. This lot and associated structures are hereinafter called the Schmidt camp. (Exhibit 9, Tax map, Parcel #56). Legal access is a 20-foot wide right of way on a gravel road now known as Lakeside Lane that runs between Lake Street and the property. Members and relatives of the Schmidt family have spent summers at the Schmidt camp and nearby properties for decades. The Schmidt Living Trust also owns an adjacent undeveloped lot of .83 acre to the east (Tax map, Parcel #57), and has a one-half interest in another undeveloped parcel of 2.47 acre to the east of Parcel #57 toward Lake Street (Tax map, Parcel #52).

Although the legal access to the Schmidt camp is via Lakeside Lane, family members have used a portion of what is now called Wolf Road, located to the north of the Schmidt Living Trust property, for many years. In this lawsuit the Co-Trustees seek to establish legal entitlement to an easement for access to the Schmidt camp through adverse use.

Original Defendants were Richard Ess, Robert Ess, and Kevin Ess, owners of property adjacent to and north of the Schmidt camp and holders of a right of access to their property via Wolf Road. Their parents were prior owners of their summer camp property on Lake Champlain. During this suit, Kevin Ess conveyed his one-third interest to his brother Robert Ess and subsequently died, leaving Richard Ess and Robert Ess as current owners of the Ess property. They hold an access easement on Wolf Road from Lake Street to their property, and a portion of Wolf Road crosses their property. During this suit, it was discovered that many other property owners in the area also held rights of access over portions of Wolf Road to their properties. These property owners have been joined in the suit as additional Defendants.

*Wolf Road*

Wolf Road has several sections, only some of which are important to this case. The pertinent section for the present claim is herein referred to as Section A, which runs in a straight line from Lake Street westerly toward Lake Champlain on a 40-foot wide right of way to the property of Defendants Ess. On the Ess property, the road makes a 90º turn to the north, and Section B then runs northerly along the backside of shorefront properties. Section C was a later addition that leaves Section A a few hundred feet from Lake Street and runs in a northwesterly direction, providing access to properties to the north.

Plaintiffs' easement claim applies only to Section A. Within Section A, there are three segments. Starting from Lake Street, Segment 1 runs from Lake Street westerly to the junction

---

[1] On some documents, it is spelled Wolfe Road. The court uses the spelling on several survey maps admitted into evidence.

point where Section C begins and runs northwest. Many Defendants have interests in Segment 1. Segment 2 starts at the junction of Sections A and C and runs westerly to the property boundary line of Defendants Ess. This Segment provides access to the properties of Defendants Ess and Zigrossi. Segment 3 crosses the southernmost tip of the Ess property and ends at the rear boundary of the Zigrossi lakefront property. Defendants Ess own this portion, and it provides access to the Zigrossi property. The Schmidt camp is immediately south of the Zigrossi and Ess properties. Plaintiffs claim a prescriptive easement across all three segments of Section A for access to the Schmidt camp. During the period of claimed adverse use, there was a spur that led off Segment 3 on the Ess property and turned south into the Schmidt camp property. It has since been blocked as described below.

There is lack of clarity about who owns the underlying fee interest in Section A of Wolf Road, which is a strip of land 40 feet wide running along the southern boundary of lands of the Landerman Trust. Plaintiffs have asked the court to determine ownership of the fee as part of their request for a declaration of the interest of Schmidt Living Trust in Wolf Road. Plaintiffs claim that the Estate of Marion MacGowan, administered by Defendant Amy Menard, is the owner of the fee. Defendants Ess claim that Defendant Donna MacGowan, the sole heir of Marion MacGowan, is the owner of the fee as a matter of probate law. Both are included in the case as Defendants because of these claims. The Estate has no assets and was only opened in response to Plaintiffs' claim that the Estate owns the underlying fee. Neither the Estate Administrator (on behalf of the Estate) nor Donna MacGowan assert claims of ownership or own any interest in any other property in the vicinity. Both request clarity as to any interest which each may hold.

This odd situation came about as follows. In 1963, J. Albert Wolf conveyed to Marion MacGowan and her husband "lots numbered #1 to #16 inclusive, all fronting on Lake Champlain and with appurtenant rights of way and 40' wide right of way to the Public Highway known as Lake Road . . ." (Plaintiff's Exhibit 5a). Thus, the MacGowans acquired only a right of way over "Wolf Road" (not then named as such) at that time. The fee interest in the underlying land remained with Mr. Wolf. Then in 1970, Mr. Wolf quitclaimed to Marion MacGowan "all lands and interests of the herein Grantor of any real estate located within the confines of the Town of Addison." (Plaintiff's Exhibit 5b). Since he still owned the fee underlying the 40-foot wide right of way, he thereby conveyed it to Marion MacGowan, who in the meantime had acquired her husband's interest in the property interests previously conveyed to both.

In 1973, Marion MacGowan conveyed to Jane M. Stott all the interests she had acquired in the 1963 deed. (Plaintiff's Exhibit 5c). The deed sets forth a full quotation of the description of the property rights conveyed to herself and her husband in the 1963 deed. Immediately following the quotation is the following:

In further aid of the description herein, reference should be made to the following:

(1) Quitclaim Deed of J. Albert Wolf to Marion K. MacGowan dated April 17, 1970, and recorded in Book 14 at page 200 of the Addison Land Records (released life estate reserved by J. Albert Wolf in "Wolf's Lodge")

(2) Order and Decree in the Addison County Court dated 21 May 1971, and recorded in Book 34 at page 420 of the Addison Land Records. (All interests of Paul E. MacGowan decreed to Marion K. MacGowan.)

Thus, although Marion MacGowan identifies the 1970 deed in which she acquired the underlying fee of the 40-foot wide right of way, it is by "reference." Surveyor Timothy Short testified that because the reference is "in . . . aid of description" rather than an outright grant, his interpretation of the deed is that the conveyance to Stott did not include the fee to the land underlying the 40-foot wide right of way, and that Marion MacGowan thus continued to hold the fee. Ms. MacGowan retained no other property interests in the area. The Town has not identified this strip of land as a separate parcel of property. The legal consequences of this document are addressed in the Analysis section of this decision below.

*History*

Jacquelyn D. Schmidt, Co-Trustee of the Plaintiff Schmidt Living Trust, is 84 years old. Her parents bought the Schmidt camp in 1963, and the following year she began spending summers there. Her parents used the legal access they had acquired on the dirt/gravel road now known as Lakeside Lane. They had no legal interest in the dirt/gravel road on the 40-foot right of way that is now Wolf Road and did not use it.

Jacquelyn Schmidt has been coming to the camp continuously since her parents purchased it. From the mid-1960's through the mid-1980's, an active community of families spent time every summer at the several lakefront cottages in the neighborhood. Some of the parents were teachers and brought their families to spend the entire summer at their summer camps. The children and parents were good friends. The children went freely around the area, using both Wolf Road and Lakeside Lane which, at that time, were unnamed one-lane dirt camp roads. Often the kids would make a loop around Wolf Road, Lake Street, Lakeside Lane, and back to Wolf Road on bicycles, horses, or motorcycles. The kids used Wolf Road to get from various camps to congregate for softball games after dinner on the empty lot opposite the Schmidt camp. The West Addison General Store (WAGS) was and is on the east side of Lake Street near the entrance to Wolf Road. An over-the-ground water pipe brought water from the lake to the store, and as a teenager, Jack Anderson, who worked at the store, used Wolf Road to get to and from the lake to hook up the pipe every year and check on it.

What is now Wolf Road was used openly by the summer population in the neighborhood without specific permission. The road was not used by the public at large except for an occasional ice fisherman in the winter. For the most part, residents of camps and members of their families shared a common community spirit, engaged in many activities together, and went back and forth freely from one property to another.

Jacquelyn Schmidt knew that her family did not have a deeded right to use Wolf Road for access. Although she used it occasionally, it was not the route she used routinely for access to the family camp. She was friends with John and Patricia Ess, parents of Defendants Richard and Robert Ess. She understood that the portion of Wolf Road just north of the Schmidt camp was owned by the Ess family and that her family had no right of access over it. Nonetheless her

4

husband, Thomas, who periodically filled in potholes on Lakeside Lane, also did so on Wolf Road. During the 1970s and 1980s, Jacquelyn Schmidt and her family spent at least a month and up to 50% of the summer from May to October at the camp.

The next generation grew up being used to using Wolf Road freely. Jacquelyn's daughter, Gretchen Conkey (now Co-Trustee), spent 6–8 weeks at camp every summer while growing up, and stayed there during her teenage years while she had summer jobs. She had her wedding at a nearby location in 1985. The after-party was held at the Schmidt camp. Friends, neighbors, and the flower delivery person all used Wolf Road to get to and from the Schmidt camp.

In 1991, Jacquelyn Schmidt and her brother each acquired a one-half interest in the camp property by Probate Court decree, and in the 1990s she spent 50% of the camp season at the property. By deeds dated July 11, 1994 and August 1, 1995, she and her brother each conveyed their one-half interests to the Schmidt Living Trust. Jacquelyn and her husband Thomas were Co-Trustees of the Trust.

In 1995, the State organized the 911 system of addresses to enable first responders to locate properties for emergency services. One day a man arrived at the Schmidt camp, stated that the property address was now 223 Wolf Road, and handed Jacquelyn Schmidt a sticker with the address on it. (Before that, neither Wolf Road nor Lakeside Lane had official names.) Consequently, Jacquelyn Schmidt believed that she had become entitled to use Wolf Road for access, and she and her family began using it regularly to access their camp.

In 1997, Jacquelyn Schmidt's husband Thomas retired, after which they moved to the camp full time for several months every summer. They put up a mailbox on Lake Street at the end of Wolf Road and received all their mail there. They lived full time at camp every summer from 1997 until 2017 and used Wolf Road to go to and from their camp. Thomas regularly maintained Wolf Road (all of Section A) by adding and spreading gravel with his small tractor and trailer and shovel, trimming fallen trees and branches away from the road, and mowing along it. Gravel was spread continuously on the spur that turned south from the western-most point of Segment 3 to the Schmidt property and ended in front of the Schmidt garage. The Schmidts had propane deliveries made to the camp regularly using Wolf Road, and contracted with a trash pickup service that used Wolf Road to get to the camp. At some point after the 1980's, the surface of Wolf Road became much improved, and it is no longer a one-lane road. It has since been maintained at a higher level than Lakeside Lane.

After 223 Wolf Road became the camp's recognized address, Wolf Road was used by others as well as Schmidt family members for access to the Schmidt camp. For example, it was routinely used for deliveries by Amazon and UPS, for visits from friends, and by contractors and service people providing services to the camp. Gretchen Conkey testified that Google Maps leads people to the Schmidt camp via Wolf Road.

Jacquelyn and Thomas Schmidt continued their full-time use of the camp every summer from 1997 to 2017, using Wolf Road as described. There was a pole on Lake Street at the turn to Wolf Road that had small shingle-type signs with the names of Wolf Road residents. The Schmidts had their name on a sign on this pole. (Exhibit 15(b)).

At some time after 2004, Section C of Wolf Road as described above was added as a turnoff to the northwest off Section A. Section C is apparently now known as Wolf Road North and leads to properties to the north. A very visible homemade sign posted at the junction where Section C left Section A said "223 Schmidt, 225 Zigrossi, 271 Ess," indicating that these three camps were located straight ahead on Section A of Wolf Road at those addresses. The sign was apparently posted for quite some time, as it was repainted at some point.

In 2017, Thomas Schmidt became ill and could no longer go to the Schmidt camp in the summer. He died in 2019. Gretchen Conkey, daughter of Jacquelyn and Thomas Schmidt, succeeded him as Co-Trustee of the Schmidt Living Trust with her mother.

On April 1, 2019, Kevin Ess erected a barrier across the spur off Wolf Road on the Ess southern boundary adjacent to the Schmidt property, thereby blocking traffic from passing to the Schmidt camp from Wolf Road. A physical barrier has remained there since. In May of 2019, the "Schmidt" sign on the pole at the end of Wolf Road on Lake Street was gone. This lawsuit ensued in 2020.

Gretchen Conkey, as Co-Trustee, has become active in exercising responsibility for the Schmidt camp. She and other members of the family have continued to use the camp regularly. She understands that owners of other properties who use various sections of Wolf Road have an agreement for sharing maintenance expenses, and she testified on behalf of the Trust that she would agree to participate in shared maintenance expenses.

Gretchen Conkey arranged for a 25-day short term rental of the Schmidt camp one summer within the last couple of years and makes the property available for vacation rental purposes on VRBO or AirBnB at times when the family is not using it. Other camps in the area have been rented out at times for either short or long-term periods. At least one camp was winterized and rented out several years ago, and later torn down and replaced with a full-time residence.

**Analysis**

***Claim for prescriptive easement***

> The elements necessary to establish a prescriptive easement and adverse possession are essentially the same under Vermont law: an adverse use or possession which is open, notorious, hostile and continuous for a period of fifteen years, and acquiescence in the use or possession by the person against whom the claim is asserted . . . 12 V.S.A. § 501. The difference lies in the interest claimed. The term "prescription" applies to the acquisition of nonfee interests, while "adverse possession" indicates that the interest claimed is in fee.

*Community Feed Store, Inc. v. Northeastern Culvert Corp.*, 151 Vt. 152, 155–56 (1989) (citations omitted).

Plaintiffs claim that the elements were met for a prescriptive easement for access to and from the Schmidt camp over Section A of Wolf Road beginning in 1965 and continuing uninterrupted until the barrier was erected in 2019, thus resulting in a ripening of an easement in

6

1980. The findings of fact do not support hostile use of Wolf Road during the period from 1965 to 1995. During that period, Jacquelyn Schmidt, who spent significant time every summer at the camp, did not use Wolf Road for access to and from the camp. She and her parents and family used Lakeside Lane, which was their legal access. They knew they did not have legal access over Wolf Road and did not use it for that purpose.

While there is evidence that "everybody" in the neighborhood used Wolf Road rather freely, this use was for social and recreational purposes among neighbors and as a playground for children, or to facilitate the local store getting water from the lake. Schmidt family members did not assert entitlement to use it for ingress and egress to their camp. The court cannot conclude that the required elements of open, notorious, hostile, and continuous use for purposes of ingress and egress to the Schmidt camp were met during the 1965–1995 period. *Deyrup v. Schmitt*, 132 Vt. 423, 425–27 (1974) (holding that children's ballgames, planting a small garden, running with a dog, placing a boat trailer, and parking cars on disputed portion of lakefront property were not "obvious adverse use[s] of the disputed property").

That changed in 1995, the year the property was acquired by the Schmidt Living Trust, and, more significantly, the year that local authorities assigned the 223 Wolf Road address to the Schmidt camp and physically delivered a sticker with that address. While whatever agency that was in charge of the 911 program did not have the power to create and assign a legally enforceable easement interest to the Schmidt Living Trust, the event prompted Jacquelyn Schmidt and her husband, Co-Trustees of the Trust, to openly use and assert a claim to use Wolf Road for access to and from their property.

From that point on, the Schmidts put up a mailbox to have mail delivered to them at the end of Wolf Road full time every summer at the Wolf Road address; they used Section A of Wolf Road regularly themselves for access to and from their property; they maintained gravel on Section A of Wolf Road and the spur turning south off Wolf Road leading into their property; they put up a sign at the intersection of Lake Street and Wolf Road indicating to visitors and service people that the way to get to their camp was on Wolf Road; they put up a sign at the intersection of Sections A and C showing that they lived straight ahead at 223 Wolf Road in a manner equal to the way the Esses and Zigrossis showed that they lived on Wolf Road; they arranged for service people and visitors to come and go from their camp via Wolf Road; and they maintained the road by filling potholes, adding gravel, trimming brush, and mowing. There is no evidence that they asked for or received permission to do any of these things. Their use was constant and frequent every summer.

The court concludes that the Schmidts' use was open, notorious, hostile, and continuous beginning as early as 1995 but at least from 1997—when they put up the mailbox and resided at the camp continuously all summer, using Wolf Road for ingress and egress and as their address—to 2019. The Schmidts' mailbox, use of the address, routine driving to and from the Schmidt camp on Section A of Wolf Road, erection of directional signs at two different locations, and visible maintenance of the road including maintaining gravel on the spur leading onto their own property constitute "unfurling of the flag" and "keeping it flying." *Barrell v. Renehan*, 114 Vt. 23, 29 (1944) (stating that the claimant must "unfurl his flag on the land, and keep it flying so

7

that the owner may see, if he will, that an enemy has invaded his dominions and planted his standard of conquest"). This is the hallmark of adverse use for purposes of asserting a claim of right for a period long enough to ripen into a prescriptive easement. The court concludes that a prescriptive easement for ingress and egress to the Schmidt camp over Section A of Wolf Road had ripened by 2012 and constitutes an enforceable legal right.

### Scope of easement

The parties have raised several issues about the scope of the easement. Plaintiffs concede that they are not seeking the benefit of the easement for Parcel #52, in which they own an undivided one-half interest with a non-party to this case. The deed by which the Schmidt Living Trust acquired the camp property conveyed two relevant parcels: #56 on the Tax Map (Exhibit 9), which is the one-acre shorefront property with the camp and garage, and #57, which is the adjacent .83-acre undeveloped lot to the east. It is unknown whether these parcels retain their character as separate lots for development purposes or whether they have merged into a single lot by operation of law for purposes of future development. In any event, the scope of adverse use as described above is for ingress and egress to a one-family dwelling only on lot #56. In other words, if any multi-family or multi-unit structures were to be erected on lot #56, or if the Trust were to develop or sell #57 as a separate lot for development, the easement recognized in this decision may not be used for such expanded use. The adverse use that created the easement was for ingress and egress to one single family residence only on lot #56, and the scope of the easement is so limited. Any multi-family or multi-unit development on lot #56 or an additional structure on lot #57 involving a new section of driveway would increase the material burden on the servient estate. "[I]ncreased use impermissibly extend[ing] the acquired prescriptive rights over the easement [is] prohibited." *Buttolph v. Erikkson*, 160 Vt. 618, 619 (1993) (citing *Dennis v. French,* 135 Vt. 77 (1977)).

Some Defendants argued that any easement should be limited to seasonal summer use. Conversion of a summer cottage to year-round use, or replacement of a summer cottage with a year-round residence, is to be expected and evidence showed that that has occurred at other properties in the vicinity of Wolf Road. Moreover, the Vermont Supreme Court has held that "an increase from seasonal to full-time use is reasonable and does not materially increase the burden on the servient estate. *Buttolph*, 160 Vt. at 619 ("Any increase in defendants' use of the driveway after becoming full-time residents on their property was a reasonable change in usage and is not grounds for now limiting their usage of the driveway."); *Wells v. Rouleau*, 2008 VT 57, ¶ 20, 184 Vt. 536.

During closing arguments some Defendants argued that the use of the easement should be limited to private family use and any easement granted should not be available for use by either short or long-term tenants. The court declines to impose such a limitation. The easement encompasses normal uses made as part of the pattern of hostile use during the prescriptive period, including use of Wolf Road to access the Schmidt property by persons including but not limited to service workers, delivery persons, cleaners, guests, and extended family members. Additionally, the scope of the easement is already limited to ingress and egress access to one dwelling unit. Whether the Schmidt camp's occupants are owners, extended family members,

invitees, or tenants has no effect on the extent of use. Either Schmidt family members or tenants or guests might stay at the property for varying lengths of time—using Wolf Road for ingress and egress throughout—and use varying numbers and types of vehicles to reach the property via Wolf Road. The status of these occupiers as tenants as opposed to owners, family members, or guests does not increase the burden on the servient estate as long as the scope is limited to access to a single family dwelling unit.

### *Relief requested*

Plaintiffs seek (a) a declaration of a prescriptive easement, (b) an injunction requiring Defendants Ess to remove the barricade on their common property line as well as any obstructions on Section A of Wolf Road preventing Plaintiffs' access to the Schmidt property via Wolf Road, and (c) determination of ownership of the fee interest in Section A of Wolf Road. The first two requests are granted based on the findings and conclusions set forth above.

The Administrator of the Estate of Marion MacGowan and Donna MacGowan both have requested determination of their interest in the 40-foot wide strip of land underlying Wolf Road, and it appears that it would be beneficial to all parties to have this resolved. Administrator Amy Menard argued at trial that while she is not aware of any extrinsic evidence regarding Marion MacGowan's intentions at the time of conveyance, she does not believe that Marion MacGowan intended to retain any interest in the properties at issue. Marion MacGowan retained no property in the vicinity of Wolf Road.

When interpreting deeds, the Court's primary objective is to uphold the drafters' intent. See *Brault v. Welch*, 2014 VT 44, ¶ 11, 196 Vt. 459 (the "master rule in construing a deed is that the intent of the parties governs") (citing *DeGraff v. Burnett*, 2007 VT 95, ¶ 20) (quotations omitted). If deeds are unambiguous, courts must enforce the terms "as written without resort[ing] to rules of construction or extrinsic evidence." *Id*. Courts "must accept the plain meaning of [unambiguous] language in a deed, without turning to construction aids." *Kipp v. Estate of Chips*, 169 Vt. 102, 107 (1999). However, "the determination of ambiguity may also involve preliminary analysis of the circumstances in which the terms are set." *Brault* at ¶ 12. If deed terms are ambiguous, courts must apply "well-established rules of construction" to determine the parties' intent. *Pion v. Bean*, 2003 VT 79, ¶ 15. Terms in deeds are ambiguous if "reasonable people could differ as to [their] interpretation." *DeGraff* at ¶ 20. If the parties' intent is "ascertainable from the plain language, the deed is not ambiguous." *Cameron's Run, LLP v. Frohock*, 2010 VT 60, ¶ 12.

There is no question that the two Wolf-MacGowan deeds (1963 and 1970) together conveyed the entirety of Mr. Wolf's interests in the contested property to Marion MacGowan. However, because the 1970 Wolf-MacGowan deed conveyed the 40-foot "Wolf Road" right of way and the 1973 MacGowan-Stott deed quotes the 1963 Wolf-MacGowan deed description followed only by a reference to the 1970 deed without quoting it, the MacGowan-Stott deed is ambiguous as to whether Ms. MacGowan conveyed her interest in this right of way to Jane M. Stott in 1973. The 1973 MacGowan-Stott deed quotes the description of conveyed property rights in the 1963 Wolf-MacGowan deed in its entirety (Plaintiff's Exhibits 5a and 5c), and incorporates the 1970 Wolf-MacGowan deed by reference. (Plaintiff's Exhibit 5c ("[i]n further

aid of the description herein, reference should be made to the . . . [q]uitclaim Deed of J. Albert Wolf to Marion K. MacGowan dated April 17, 1970"). It is this incorporation of the 1970 Wolf-MacGowan deed by reference which leads to ambiguity to be resolved by the court as a matter of deed interpretation.

When interpreting ambiguous language in deeds, courts must attempt to determine the drafter's intent by examining the deed as a whole. *Kipp*, 169 Vt. at 105, 107. If language elsewhere in the instrument does not illuminate the drafter's intent, proper interpretation of the ambiguous term becomes a question of fact that the court must then determine based on all relevant evidence. *Id*. at 107. Relevant evidence may include evidence concerning the deed's subject matter, purpose at the time of execution, and the parties' "situation[s]." *DeGraff*, 2007 VT 95, ¶ 20. Relevant evidence in this instance includes: the 1963 Wolf-MacGowan deed (Plaintiff's Exhibit 5a); the 1970 Wolf-MacGowan deed (Plaintiff's Exhibit 5b); the 1973 MacGowan-Stott deed (Plaintiff's Exhibit 5c); Surveyor Timothy L. Short's testimony at trial regarding his interpretation of the deed, and the fact that Marion MacGowan owned no other property in the vicinity, to which a 40-foot wide right of way could possibly be appurtenant, following her 1973 conveyance to Jane M. Stott.

Although the 1973 deed does not explicitly make the "to have and to hold" language applicable to the fee interest under Wolf Road conveyed by the 1970 Wolf-MacGowan deed, its reference to the 1970 deed supports a finding that Ms. MacGowan intended to deed to Ms. Stott the entirety of land she received in the two Wolf-MacGowan deeds, particularly since she retained no interest in any property in the area. It is more logical that Ms. MacGowan would intend to convey the entirety of her interests in the property rather than intentionally reserve a strip of land for access to property she no longer owned. Neither the Estate nor Donna MacGowan owned any other property in the vicinity after the 1973 conveyance or now.

If Ms. MacGowan had intended to reserve any rights to the property which were not included in the 1963 Wolf-MacGowan deed—"lots numbered #1 to #16 inclusive, all fronting on Lake Champlain and with appurtenant rights of way and 40' wide right of way to the Public Highway known as Lake Road . . ."—she would have either refrained from incorporating the more-inclusive 1970 deed in any manner or explicitly excluded what rights she wished to reserve. Instead, she incorporated the 1970 deed's description of the property in question to "aid . . . the description" of the rights she was then deeding to Jane M. Stott.

At trial, Mr. Short interpreted the incorporative deed language "in further aid of the description herein" as insufficient to convey any rights described in the 1970 deed to Jane M. Stott. However, the court places more weight on the evidence of drafters' intent derived from the language of the Wolf-MacGowan and MacGowan-Stott deeds themselves and the circumstances that Marion MacGowan transferred all property in the vicinity, leaving no purpose for ownership of a 40-foot wide strip of land used by others as a road. As such, the court resolves the ambiguity in the 1973 deed by concluding that the 1973 MacGowan-Stott deed conveyed the 40-foot right of way in Wolf Road to Jane M. Stott. Marion MacGowan specifically referenced the 1970 deed and retained no property interests in the vicinity to which a fee interest in a right of way might be

pertinent. Accordingly, the court concludes that neither the Estate of Marion MacGowan nor Donna MacGowan have any interest in the underlying fee to Wolf Road.

The court declines to make a determination regarding the present ownership of the fee interest in the 40-foot wide strip, however, as this was not a litigated issue between the parties.

## Summary and Order

Based on the foregoing, the court will issue a judgment that includes:

(1) a declaration of a prescriptive easement for Plaintiffs' ingress and egress over what is described above as Section A of Wolf Road to access the Schmidt camp lot (#56 on tax map);

(2) an injunction requiring Defendants Ess to remove the barricade on their common property line as well as any obstructions on Section A of Wolf Road preventing Plaintiffs' access to the Schmidt property via Wolf Road; and

(3) a declaration that neither the Estate of Marion MacGowan nor Donna MacGowan own any property interest in the fee underlying the 40-foot right of way known as Wolf Road.

Plaintiffs' counsel shall submit a proposed form of Judgment by April 1, 2024 for review by Defendants pursuant to V.R.C.P. 58 (d). The description of the easement should be sufficiently explicit for purposes of recording in the land records. Plaintiffs' counsel is encouraged to communicate in advance with counsel for the Defendants who hold interests in Wolf Road in an effort to reach an agreement as to the terms of the judgment.

Electronically signed March 13, 2024 pursuant to V.R.E.F. 9 (d).

*Mary Miles Teachout*

Mary Miles Teachout
Superior Judge (Ret.), Specially Assigned